[833 NE2d 261, 800 NYS2d 118]

DAVID L. THORNTON et al., Respondents-Appellants, v SHLOMO BARON et al., Defendants, and 390 WEST END ASSOCIATES, L.L.C., Appellant-Respondent.

Argued June 7, 2005; decided June 30, 2005

176

POINTS OF COUNSEL

*Belkin Burden Wenig & Goldman, LLP,* New York City (*Magda L. Cruz, Sherwin Belkin, Howard Wenig* and *Jay H. Berg* of counsel), for appellant-respondent. I. The legal regulated rent for the new rent stabilized prime lease to the subtenants was properly calculated in accordance with "the four year rule." (*Matter of Gilman v New York State Div. of Hous. & Community Renewal,* 99 NY2d 144; *Myers v Frankel,* 292 AD2d 575; *Zafra v Pilkes,* 245 AD2d 218; *Matter of Silver v Lynch,* 283 AD2d 213; *Matter of McCarthy v New York State Div. of Hous. & Community Renewal,* 290 AD2d 313; *Matter of Sessler v New York State Div. of Hous. & Community Renewal,* 282 AD2d 262; *Matter of Hatanaka v Lynch,* 304 AD2d 325; *Matter of Kandemir v New York State Div. of Hous. & Community Renewal,* 4 AD3d 122; *Matter of AVJ Realty Corp. v New York State Div. of Hous. & Community Renewal,* 8 AD3d 14; *Matter of Brinckerhoff v New York State Div. of Hous. & Community Renewal,* 275 AD2d 622, 96 NY2d 712.) II. The uncodified "default formula" has no applicability to this case. (*Myers v Frankel,* 184 Misc 2d 608; *Matter of Greenthal Co. v State Div. of Hous. & Community Renewal,* 126 Misc 2d 795; *Matter of Miller v Division of Hous. & Community Renewal,* 289 AD2d 20; *Matter of Spariosu v New York State Div. of Hous. & Community Renewal,* 285 AD2d 649; *Matter of Century Tower Assoc. v State of N.Y. Div. of Hous. & Community Renewal,* 83 NY2d 819; *Matter of Lavanant v State Div. of Hous. & Community Renewal,* 148 AD2d 185; *Matter of Clear Holding Co. v State Div. of Hous. & Community Renewal,* 268 AD2d 430.) III. If a "default formula" is to apply, then the Court should adopt the *codified* default formula at Rent Stabilization Code (9 NYCRR) § 2522.6 (b) and remand the matter to the Division of Housing and Community Renewal. (*Matter of Cabrini Realty v New York State Div. of Hous. & Com-*

*munity Renewal,* 6 AD3d 280; *390 W. End Assoc. v Zouker,* 302 AD2d 227.)

*Vernon & Ginsburg, LLP,* New York City (*Darryl M. Vernon* and *Michael T. Yonker* of counsel), for respondents-appellants. I. The prospective rent should be set as of the commencement of the void illusory lease. (*Simcuski v Saeli,* 44 NY2d 442; *General Stencils v Chiappa,* 18 NY2d 125; *Glus v Brooklyn Eastern Dist. Terminal,* 359 US 231; *390 W. End Ave. Assoc. v Youngstein,* 221 AD2d 292; *Matter of Brinckerhoff v New York State Div. of Hous. & Community Renewal,* 275 AD2d 622; *Matter of Sessler v New York State Div. of Hous. & Community Renewal,* 282 AD2d 262; *390 W. End Assoc. v Baron,* 274 AD2d 330; *Mondello v New York Blood Ctr.—Greater N.Y. Blood Program,* 80 NY2d 219; *Brock v Bua,* 83 AD2d 61; *Buran v Coupal,* 87 NY2d 173.) II. Because of 390 West End Associates, L.L.C.'s evasion of rent regulation, and to deter similar attempts by other landlords, the prospective rent should be set by the default formula articulated below or, alternatively, at the last lawful rent. (*390 W. End Assoc. v Harel,* 298 AD2d 11; *Matter of Cabrini Realty v New York State Div. of Hous. & Community Renewal,* 6 AD3d 280.) III. If this Court does not set the rent as of the inception of the void lease, then the lower courts' application of the default formula should be affirmed. (*390 W. End Assoc. v Baron,* 274 AD2d 330; *Diocese of Buffalo v McCarthy,* 91 AD2d 213; *Rivertower Assoc. v Chalfen,* 167 AD2d 309; *Myers v Frankel,* 292 AD2d 575; *Matter of Sessler v New York State Div. of Hous. & Community Renewal,* 282 AD2d 262; *Matter of Kandemir v New York State Div. of Hous. & Community Renewal,* 4 AD3d 122; *Matter of Muller v New York State Div. of Hous. & Community Renewal,* 263 AD2d 296; *Matter of Pechock v New York State Div. of Hous. & Community Renewal,* 253 AD2d 655; *Matter of Hatanaka v Lynch,* 304 AD2d 325; *Matter of McCarthy v New York State Div. of Hous. & Community Renewal,* 290 AD2d 313.)

### OPINION OF THE COURT

Chief Judge KAYE.

We are asked in this appeal to establish the legal regulated rent for an apartment improperly removed from rent stabilization.

Defendant 390 West End Associates is the owner of the Apthorp, a residential apartment building on the Upper West Side of Manhattan. In the early 1990s, the owner hit upon a scheme to remove a number of its apartments from the protec-

tions of rent regulation by taking advantage of the statutory exemption for nonprimary residences (*see* Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-504 [a] [1] [f]). Having included in its leases a provision that the tenants would not use the apartments as primary residences, 390 offered at least six such leases charging rent far in excess of the legal stabilized rent. Several of these apartments were immediately subleased to third parties who would also agree not to primarily reside in the apartment. In nearly every case, however, either the tenant or subtenant—despite representations to the contrary—used the apartment as a primary residence.

In December 1992, defendant Shlomo Baron entered into such a lease. Under its terms, Baron agreed to rent a four-room apartment—for which the previous tenant had paid a stabilized rent of $507.85 per month—for an initial monthly rent of $2,400, with increases beginning after three years. Baron then immediately subleased the apartment to Cynthia and David Thornton for $3,250 per month, increasing to $3,500 after two years and then to $3,750 after three.

Baron was represented in these transactions by his daughter and son-in-law, Zipora and Bernard Weber, themselves rent-stabilized tenants at the Apthorp. Indeed, the Webers acted as agents for at least two other tenants—one of them Baron's son—who similarly conspired with the owner to circumvent rent stabilization by leasing apartments as nonprimary residences above the regulated rent, so as then to sublease the apartments at even higher rents. In this way, both the owner and the prime tenants earned profits far above what the Rent Stabilization Law allowed.

In an effort to obtain judicial sanction of these arrangements, in 1993 the owner sought and won declaratory judgments that these apartments, as nonprimary residences, were exempt from rent stabilization. In each case the owner, as plaintiff, filed an action against its tenant (named as defendant) seeking declaratory relief. Filing no answer, the purported defendant instead quickly entered into a stipulation with the plaintiff agreeing to the entry of a consent judgment upholding the terms of the parties' bargain. Although no justiciable controversy actually existed, the parties thus endeavored to use the courts to achieve their joint purpose of freeing the apartments from regulation. Further, having obtained judicial endorsement of the leases, the owner then filed annual rent registration statements setting

forth the agreed-upon rents and listing the apartments as temporarily exempt from rent stabilization (*see* Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-517 [a]).

A lease provision purporting to exempt an apartment from rent regulation in exchange for an agreement not to use the apartment as a primary residence is against public policy and void (*see Draper v Georgia Props.*, 94 NY2d 809 [1999]; Rent Stabilization Code [9 NYCRR] § 2525.3 [b]; § 2520.13). In 1999, the owner moved to vacate the Baron consent judgment and restore the subject apartment to rent stabilization. Although the parties differ with respect to 390's motive for bringing this motion—the owner claims that it sought simply to comply with the law, while the subtenant ascribes more nefarious purposes— the judgment was ultimately vacated (*see 390 W. End Assoc. v Baron*, 274 AD2d 330 [1st Dept 2000]).

Meanwhile, in 1996, the Thorntons commenced the present action against Baron and the Webers, claiming rent overcharges under the Rent Stabilization Law. Although the Thorntons made false written statements to the contrary at the time they signed their sublease, the record reveals that they have used the subject apartment as their primary residence since the commencement of their subtenancy. Supreme Court thus determined that Baron's tenancy was illusory and that the Thorntons were the actual tenants of the apartment, which should never have been removed from rent stabilization.

In November 2000, the Thorntons amended their complaint to name the owner as a defendant, adding a cause of action to compel the owner to offer them a rent-stabilized lease at $507.85 per month—the regulated rent immediately preceding Baron's illusory tenancy. In response, the owner conceded that the apartment was subject to rent stabilization, but contended that the legal rent was to be calculated from a base date rent of $2,496— the rent reflected in the annual registration statement filed in 1996, four years before plaintiffs filed their amended complaint. Supreme Court, however, adopted neither view. Rather, the court ruled that the legal rent must be fixed based on the default formula used by the Division of Housing and Community Renewal (DHCR) to set the base date rent in overcharge cases

where no reliable rent records are available.[1] The Appellate Division split over this question, with the majority endorsing Supreme Court's methodology and the dissent accepting plaintiffs' view that the legal regulated rent should be that in effect at the commencement of the illegal Baron lease in 1992 ($507.85). We now affirm.

Only one question is before us: How is the legal regulated rent of the apartment to be established? As the courts below recognized, the Rent Regulation Reform Act of 1997 (RRRA) (L 1997, ch 116) clarified and reinforced the four-year statute of limitations applicable to rent overcharge claims (see Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-516 [a]) by limiting examination of the rental history of housing accommodations prior to the four-year period preceding the filing of an overcharge complaint (see Matter of Gilman v New York State Div. of Hous. & Community Renewal, 99 NY2d 144, 149 [2002]; L 1997, ch 116, § 33). "Where the amount of rent set forth in the annual rent registration statement filed four years prior to the most recent registration statement is not challenged within four years of its filing, neither such rent nor service of any registration shall be subject to challenge at any time thereafter" (Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-516 [a]).

Here, plaintiffs filed their amended complaint—which named 390 as a defendant for the first time—in November 2000.[2] This is not a situation where an order issued prior to the limitations period imposed a continuing obligation on a landlord to reduce rent, such that the statute of limitations would be no defense to an action based on a breach of that duty occurring within the limitations period. Thus, the apartment's rental history before November 1996 may not be examined, and the $507.85 rent in effect in 1992 is of no relevance.[3] That being so, the owner contends that the legal regulated rent should be established by

---

1. This formula uses the lowest rent charged for a rent-stabilized apartment with the same number of rooms in the same building on the relevant base date.

2. We reject plaintiffs' contention that their amended complaint against 390 should relate back to the original complaint filed against Baron and the Webers in October 1996, because defendants were not united in interest within the meaning of CPLR 203 (b) (see Buran v Coupal, 87 NY2d 173 [1995]).

3. Because defendants' fraudulent scheme to evade the Rent Stabilization Law did not induce plaintiffs to refrain from filing a timely action, the owner is not equitably estopped from invoking the statute of limitations (see Simcuski v Saeli, 44 NY2d 442, 448-449 [1978]).

simple reference to the rental history as of November 1996, by which time an annual registration statement had been filed listing the $2,496 rent charged to Baron.[4] We disagree.

Reflecting an attempt to circumvent the Rent Stabilization Law in violation of the public policy of New York, the Baron lease was void at its inception. Further, because the rent it purported to establish was therefore illegal, the 1996 rent registration statement listing this illegal rent was also a nullity. Under those circumstances, we agree with Supreme Court and the Appellate Division majority that the default formula used by DHCR to set the rent where no reliable rent records are available was the appropriate vehicle for fixing the base date rent here.[5]

The dissent would ignore defendants' fraudulent conduct and fix the rent at an amount likely soon to result in the apartment's permanent removal from rent stabilization, thereby rewarding the owner's wrongdoing. Under the dissent's rule, a landlord whose fraud remains undetected for four years—however willful or egregious the violation—would, simply by virtue of having filed a registration statement, transform an illegal rent into a lawful assessment that would form the basis for all future rent increases. Indeed, an unscrupulous landlord in collusion with a tenant could register a wholly fictitious, exorbitant rent and, as long as the fraud is not discovered for four years, render that rent unchallengeable. That surely was not the intention of the Legislature when it enacted the RRRA. Its purpose was to alleviate the burden on honest landlords to retain rent records indefinitely (*see Gilman*, 99 NY2d at 149), not to immunize dishonest ones from compliance with the law.

Although the subtenants who brought the overcharge complaint themselves had unclean hands, the principle we establish here will apply equally to innocent renters looking to succeed illusory tenancies. The dissent's contrary rule would bring about the rapid removal of many apartments from rent

---

4. Once the legal regulated rent reaches $2,000, an apartment will be removed altogether from rent stabilization if either the apartment becomes vacant (*see* Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-504.2 [a]) or the tenants' total annual income exceeds $175,000 in each of the two preceding calendar years (*see* Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-504.3 [b]).

5. Although 390 proposes that we adopt the default formula of Rent Stabilization Code (9 NYCRR) § 2522.6 (b), that provision by its plain terms applies only to judicial sales, bankruptcy proceedings and mortgage foreclosure actions.

stabilization—at least six such illusory leases have come to light in the Apthorp alone—undermining the statute's very purpose of preserving a stock of affordable housing. We cannot agree that the Legislature intended such a result.

We reach this conclusion not "so that one wrongdoer may benefit at the expense of another" (dissenting op at 183), but so that no wrongdoer may benefit at the expense of the public.

Accordingly, the order of the Appellate Division should be affirmed, without costs, and the certified question answered in the affirmative.

R.S. SMITH, J. (dissenting). The Rent Regulation Reform Act of 1997 amended the Rent Stabilization Law of 1969 to provide: "Where the amount of rent set forth in the annual rent registration statement filed four years prior to the most recent registration statement is not challenged within four years of its filing, neither such rent nor service of any registration shall be subject to challenge at any time thereafter" (Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-516 [a]). Today, the majority upholds a challenge to the amount of rent set forth in a registration statement, although the challenge was brought more than four years after the registration statement was filed. If I had written the statute, I would now be wondering what words I could possibly have used to make my meaning clearer.

The majority tries to reconcile its holding with the statute on the theory that the lease containing the challenged rent (entered into more than seven years before the challenge was brought) was in violation of public policy and "void at its inception" (majority op at 181). Therefore, the majority reasons, "the rent . . . was . . . illegal, [and] the 1996 rent registration statement listing this illegal rent was also a nullity" (majority op at 181). This approach destroys the effectiveness of the four-year time limitation, which has no point unless it protects illegal rents against challenge. If a rent is not illegal, a challenge will fail anyway and the four-year limit is unnecessary.

Plainly, the true basis for the majority's holding is the outrageousness of the landlord's conduct in this case. This is apparent from the torrent of adjectives—"fraudulent," "willful," "egregious," "unscrupulous," "fictitious," "exorbitant," "dishonest"—that the majority finds room for in a single paragraph (majority op at 181). Every one of the adjectives is deserved, but none of them justifies ignoring the statute. Statutes of limitations and similar enactments must, by their

very nature, sometimes protect outrageous conduct. Many wrongs greater than the one done in this case have gone unremedied because the victim did not seek a remedy promptly enough. Here, the subtenants' remedy was to challenge the rent established by the 1992 lease within four years, and nothing prevented them from doing so. If the landlord had somehow tricked them into delaying their lawsuit, the landlord might be equitably estopped from relying on the lapse of time, but nothing of that sort happened.

Indeed, the subtenants who brought this case are less the landlord's victims than its coconspirators. The subtenants agreed to pay some six times the legal rent for the apartment in question, and to make the false representation that it was not their primary residence, for the obvious reason that they could not get this highly desirable apartment any other way. The real victim of the conspiracy was the unknown person who, but for the misconduct of all the parties to this case, could have rented an apartment in the Apthorp in 1992 for a bit more than $500 per month.

I acknowledge that the subtenants, despite their unclean hands, were entitled to challenge the unlawful rent that they agreed to pay—but they had four years to do so and no more. I see no good reason for the majority's decision to ignore the four-year limitation so that one wrongdoer may benefit at the expense of another. I would therefore modify the Appellate Division's order and would hold that the $2,496 rent set forth in the 1996 registration statement may not be challenged.

Judges G.B. SMITH, CIPARICK, ROSENBLATT and GRAFFEO concur with Chief Judge KAYE; Judge R.S. SMITH dissents in a separate opinion in which Judge READ concurs.

Order affirmed, etc.